<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: COMPENSATION OF | : | MDL DOCKET NO. 1471 |
| MANAGERIAL, PROFESSIONAL | : | |
| AND TECHNICAL EMPLOYEES | : | MASTER DOCKET NO. 02-CV-2924 |
| ANTITRUST LITIGATION | : | (GEB) |
| | : | |
| | : | **MEMORANDUM OPINION** |
| | : | |

<u>**BROWN, District Judge**</u>

This matter comes before the Court upon Defendants' motion for summary judgment (Docket No. 151). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. The Court considered the parties' submissions and heard oral argument on July 24, 2008. For the reasons set forth below, the Court will grant Defendants' motion for summary judgment.

## I.    RELEVANT BACKGROUND

Plaintiffs, several managerial, professional and technical ("MPT") employees of certain major U.S. oil companies ("Plaintiffs"), allege that defendant oil companies ("Defendants"), in violation of Section 1 of the Sherman Act, exchanged detailed salary information so as "to suppress the growth in oil industry salary levels" and eliminate a so-called "oil industry premium" paid on the salaries of MPT employees.

This case originates from four separate suits that were consolidated before this Court in June 2002 by the Judicial Panel on Multidistrict Litigation. <u>Todd v. Exxon</u>, the first of the four consolidated cases to be filed, was commenced in 1997 in the Southern District of New York. Two cases were subsequently filed in this district and one case was filed in the Northern District

of Texas.

      Prior to its consolidation before this Court, the <u>Todd v. Exxon</u> matter was dismissed by the Southern District of New York for failure to state a claim because "the relevant market proposed by Plaintiff does not rise to the level of plausibility required in an antitrust action." <u>Todd v. Exxon</u>, 126 F. Supp. 2d 321, 325 (S.D.N.Y.), <u>vacated by</u>, 275 F.3d 191 (2d Cir. 2001). The Second Circuit vacated the dismissal and remanded the matter to the district court, finding "the allegation of a market limited to employers in the oil and petrochemical industry is plausible on its face." <u>Todd</u>, 275 F.3d at 205.

      After consolidation, discovery in the consolidated action was bifurcated and initially limited to class certification issues.  Plaintiffs has moved twice for class certification and this Court has denied both motions.  On March 27, 2003, the Court denied Plaintiffs' first motion to certify a class under Federal Rule of Civil Procedure 23(b)(3).  After mediation efforts failed, Plaintiffs sought class certification for an injunction class under Rule 23(b)(1) or 23(b)(2).  On January 5, 2006, this Court denied Plaintiffs' second motion for class certification.  On February 15, 2006, the Court denied a motion for reconsideration of that decision.

      On the motion for reconsideration, Plaintiffs argued that the Court overlooked a key holding from the Second Circuit's decision in <u>Todd</u>, namely that "'[i]f a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power[,]' and 'arguably is more direct evidence of market power than calculations of elusive market share figures.'" (Op. on Mot. for Recons., Docket No. 128 at 2 (<u>quoting</u> <u>Todd</u>, 275 F.3d at 206).)  This Court denied the motion for reconsideration and clarified that "even using the direct evidence method, at a minimum, Plaintiffs must define the parameters of the

market in question." Id.  The case was subsequently stayed and referred to mediation.

On January 7, 2008, the parties advised the Court that mediation had again proven

unsuccessful.  Defendants requested a briefing schedule for summary judgment on the issues of

relevant market and market power.  Plaintiff did not oppose the briefing schedule, but informed

the Court that they might file a Rule 56(f) affidavit seeking additional discovery.  On February

21, 2008, the present motion was filed.  As discussed below, Defendants seek summary judgment

because "plaintiffs cannot meet their burden to prove that defendants' information exchanges

caused harm to competition within a relevant market."  (Defs.' Br. at 36.)  Plaintiffs oppose this

motion and have filed a Rule 56(f) affidavit.

## II.    SUMMARY JUDGMENT STANDARD OF REVIEW

In deciding a motion for summary judgment, a court should grant the motion if "there is

no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a

matter of law."  FED. R. CIV. P. 56(c).  See also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

(1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996).  The threshold

inquiry is whether "there are any genuine factual issues that properly can be resolved only by a

finder of fact because they may reasonably be resolved in favor of either party."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  In deciding whether triable issues of fact exist,

the court must view the underlying facts and draw all reasonable inferences in favor of the non-

moving party.  See Hancock Indus. v. Schaeffer, 811 F.2d 225, 231 (3d Cir. 1987).  In arguing

against a motion for summary judgment, "an adverse party may not rest upon the mere

allegations or denials of the adverse party's pleading, but the adverse party's response . . . must

set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).

3

Federal Rule of Civil Procedure 56(f) provides as follows:

If a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
(1) deny the motion;
(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or
(3) issue any other just order.

FED. R. CIV. P. 56(f).  To succeed under Rule 56(f), a party usually "must identify with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." Lunderstadt v. Colafella, 885 F.2d 66, 71 (3d Cir. 1989) (internal quotations and citations omitted).  "However, because '[a] district court has discretion in acting on Rule 56(f) motions,' this list of factors is not exhaustive. Instead, it 'simply offer[s] a guide for the district court to follow in exercising its discretion under Rule 56(f).'" Horvath v. Keystone Health Plan East, Inc., 333 F.3d 450, 458 (3d Cir. 2003) (internal quotations and citations omitted).   Regardless of the Court's determination, "[i]t is 'improper' for a district court to rule on summary judgment without first ruling on a pending Rule 56(f) motion." Doe v. Abington Friends School, 480 F.3d 252, 257 (3d Cir. 2007) (citation omitted).

## III.   SECTION 1 OF THE SHERMAN ACT

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.  "To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was

4

injured as a proximate result of the concerted action." <u>Gordon v. Lewistown Hosp.</u>, 423 F.3d 184, 207 (3d Cir. 2005).

To determine whether a particular action unreasonably restrains trade, courts have applied one of two different methods of analysis: (1) the per se rule; and (2) the rule of reason. Under the per se rule, certain categories of restraints are simply presumed to be unreasonable and no elaborate inquiry is necessary. <u>See</u>, <u>e.g.</u>, <u>Business Elecs. Corp. v. Sharp Elecs. Corp.</u>, 485 U.S. 717, 723 (1988) ("per se rules are appropriate only for 'conduct that is manifestly anticompetitive'") (quoting <u>Continental T.V., Inc. v. GTE Sylvania Inc.</u>, 433 U.S. 36, 50 (1977)). On the other hand, the rule of reason, which is the "prevailing standard," ordinarily requires the Court to engage in a detailed analysis of the effect that the restraint has on competition in a relevant market. <u>See</u> <u>Sylvania Inc.</u>, 433 U.S. at 50-51, 53 n.21 (holding that the rule of reason typically requires a detailed examination "in light of the competitive situation in 'the product market as a whole'"); <u>United States v. Brown Univ.</u>, 5 F.3d 658, 672 (3d Cir. 1993) (holding that the rule of reason "ordinarily requires a detailed inquiry into the market impact of a restraint").[1]

Here, Plaintiffs allege that Defendants engaged in data exchanges that allegedly restrained

---

[1]"[A] third standard that falls somewhere between the rule of reason and per se standards" is the "quick look" rule of reason. <u>Rossi v. Standard Roofing, Inc.</u>, 156 F.3d 452, 461 n.6 (D.N.J. 1998). This method "applies in cases where per se condemnation is inappropriate but where no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint." <u>Gordon</u>, 423 F.3d at 209-210 (citing <u>Brown Univ.</u>, 5 F.3d at 669). Under the "quick look" method, "the competitive harm is presumed and the defendant must set forth some competitive justification for the restraints." <u>Id.</u> at 210. "[T]he quick look approach may be applied only when an observer with even a rudimentary understanding of economics could conclude that the arrangement in question would have an anticompetitive effect on customers and markets." <u>Id.</u> As the Second Circuit found in <u>Todd</u>, "[t]he alleged conduct in this case-the exchange of information-is not so inherently or intuitively anticompetitive." 275 F.3d at 207.

competition.  According to Plaintiffs, the "central premise of this case" is an "information

exchange [that] was designed to eliminate" the wage premium over "general industry wage

levels" paid to MPT employees by Defendants.  (Pls.' Br. at 5.)  Such information exchanges are

subject to analysis under the rule of reason.  United States v. United States Gypsum Co., 438

U.S. 422 (1978); Todd, 275 F.3d at 199.  This is because "[t]he exchange of price data and other

information among competitors does not invariably have anticompetitive effects; indeed such

practices can in certain circumstances increase economic efficiency and render markets more,

rather than less, competitive."  United States Gypsum Co., 438 U.S. at 441 n.16.

## IV.    SUMMARY OF THE PARTIES' ARGUMENTS

Defendants argue that "Plaintiffs have not presented evidence sufficient to create a triable

issue of fact with respect to their claim that defendants' information sharing caused

anticompetitive effects in a relevant market."  (Defs.' Br. at 1.)  Defendants argue that Plaintiffs

cannot prove that "the relevant product market is limited to oil and petrochemical industry

employers or that they lack substitutable job opportunities outside of those employers."  (Id.)

Defendants contend that "plaintiffs' own admissions" in depositions demonstrate the falsity of

their theory "that they lack outside job opportunities because they have developed industry-

specific expertise that eliminates other employers as substitutes."  (Id. at 2.)  Defendants further

argue that this Court, in denying class certification, has already rejected any attempt by Plaintiffs

to proceed without having to prove a relevant product market.  (Id. at 6-7.)  Defendants argue that

Plaintiffs "cannot escape" the requirement that they prove a relevant market.  (Id. at 7.)

Plaintiffs respond by asserting that discovery has been denied on the "core issue" in this

case, namely, "whether defendants were able to suppress the growth in oil industry salary levels

so as to achieve their goal of eliminating the 'oil industry premium.'" (Pls.' Br. at 1.)  Plaintiffs

contend that Defendants seek "to disprove the existence of relevant markets that plaintiffs have

not alleged and have no bearing on the conduct challenged in this case."   (Id.)  Plaintiffs point to

the Complaint filed in June 1997 in the Todd case, which they contend focuses on the market

"for the services of experienced, salaried, non-union, managerial, professional and technical

(MPT) employees in the oil and petrochemical industry, in the continental United States and the

various submarkets thereof."  (Id. at 1-2 (quoting Compl. at ¶ 97).)  Plaintiffs state that the

Second Circuit already ruled that this was a plausible market despite the fact that the named

plaintiff in that case, Roberta Todd, had found alternative employment "outside of the industry at

higher pay."  (Id. at 2.)  Plaintiffs contend that summary judgment is inappropriate because

Defendants rely "on nothing more than the same facts that the Second Circuit *rejected* as

[in]sufficient to defeat plaintiffs' claims."  (Id. at 3 (emphasis in original).)  Specifically,

Plaintiffs claim that Defendants rely on "nothing other than evidence that these plaintiffs could

have been employed by non-defendants employers outside of the oil and petrochemical industry."

(Id. at 2.)  Plaintiffs argue that the Defendants' market power over the relevant market alleged

can be demonstrated through evidence that Defendants "were able to suppress the growth in

industry salary levels" for MPT employees.  (Id. at 5.)

Plaintiffs also argue that the discovery permitted to date raises genuine issues of material

fact that preclude summary judgment.  (Id. at 5, 23-26.)  Plaintiffs points out that the "data

exchange in this case was extensive, detailed and highly suspicious," that Defendants "sought to

align salaries with . . . other oil companies, and the extensive data provided through the [Oil

Industry Group] allowed them to do so."  (Id. at 5-6.)  Plaintiffs state that pay levels within the

oil industry were higher than pay levels outside of the industry and that "defendants' efforts to reduce the differential between oil industry and general industry pay were meeting with some success."  (Id. at 7-8.)

Finally, Plaintiffs contend that summary judgment should be denied because "merits discovery . . . may reveal direct evidence of an agreement among these defendants," which would be per se illegal.  (Id. at 7.)  Plaintiffs also outline a number of topics on which they wish to take discovery.  (Id. at 10, 37-40.)

Defendants reply that Plaintiffs use the "flawed approach" of referencing the "*average* compensation paid to tens of thousands of employees occupying thousands of different jobs," despite the fact that the "cases now involve antitrust claims of ten individuals who had specific jobs." (Defs.' Reply Br. at 1 (emphasis in original).)  Defendants condemn as "false logic" Plaintiffs' argument that evidence of a reduction in an average "oil industry premium" somehow proves an anticompetitive effect in the markets relevant to the individual plaintiffs.  Defendants assert that the Court "has already rejected this proposed junk economics."  (Id. at 4.)

## V.     THE COURT'S ANALYSIS

### A.     Proving Market Power: The Traditional Method and the Direct Evidence Method

The Todd court stated that an important factor in analyzing a data exchange under the rule of reason is "the market power of the defendants."   275 F.3d at 199.  According to the Todd court, "[o]ne traditional way to demonstrate market power is by defining the relevant product market and showing defendants' percentage share of that market."  Id.  However, "[m]arket power defined as a percentage market share . . . is not the only way to demonstrate defendants'

abilities to depress salaries." Id. at 206.  The Todd court stated that "[i]f a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power." Id.  Moreover, "this arguably is more direct evidence of market power than calculations of elusive market share figures." Id. (citing Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 98 (2d Cir. 1998) (stating that market power 'may be proven *directly* by evidence of the control of prices . . . or it may be *inferred* from one firm's large percentage share of the relevant market")).

### 1.    Traditional Method

Under the traditional method of demonstrating market power, "[p]laintiffs have the burden of defining the relevant market." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d at 436 (citing Pastore v. Bell Telephone Co. of Pennsylvania, 24 F.3d 508, 512 (3d Cir. 1994); Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 726 (3d Cir. 1991)).  Plaintiffs then seek to demonstrate market power through the Defendants' share of the relevant market. Todd, 275 F.3d at 199.

In the antitrust context, "relevant market" means the "one relevant to the particular legal issue at hand." 2B Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application (3d ed. 2007) ¶ 533.  "'The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.'" Queen City Pizza, 124 F.3D at 436 (citing Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962); Tunis Bros., 952 F.2d at 722).  As the Third Circuit noted, "'[c]ross-elasticity of demand is a measure of the substitutability of products from the point of view of buyers.  More technically, it measures the

9

responsiveness of the demand for one product to changes in the price of a different product.'" Queen City Pizza, 124 F.3d at 438 n.6 (quoting E. Thomas Sullivan and Jeffrey L. Harrison, Understanding Antitrust and its Economic Implications 217 (1994)).  "Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." Todd, 275 F3d 191, 201-202 (citation omitted).  Thus in a normal case, "the inquiry is whether a 'hypothetical cartel' would be 'substantially constrain[ed]' from increasing prices by the ability of customers to switch to other producers."  Id.

As the Todd court stated, "[t]he fact that this case involves a buyer-side conspiracy affects how the market is defined," because the relevant market factors "are reversed in the context of a buyer-side conspiracy." 275 F.3d at 201-02.  "This market is comprised of buyers who are seen by sellers as being reasonably good substitutes."  Id. at 202 (citation omitted). Thus, "[t]he proper focus is . . . the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers."  Id.  "At issue is the interchangeability, from the perspective of an MPT employee, of a job opportunity in the oil industry with, for example, one in the pharmaceutical industry."  Id.  "A greater availability of substitute buyers indicates a smaller quantum of market power on the part of the buyers in question."  Id.

"[I]n most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers."  Queen City Pizza, 124 F.3d at 436 (citations omitted).  Indeed, summary judgment is often inappropriate because the pertinent economic facts are disputed.  However, summary judgment is appropriate where the relevant economic facts are not disputed.  See, e.g., Pocono Invitational Sports Camp v. NCAA, 317 F. Supp. 2d 569, 587-87 (E.D. Pa. 2004) (granting summary judgment to defendant where plaintiff did not provide

evidence demonstrating that relevant market was limited to summer basketball camps and did not include other athletic camps).

In this case, the Second Circuit in Todd recognized that "Plaintiff[s] claim[] that MPT employees accumulate industry-specific knowledge that renders them more valuable to employers in the oil and petrochemical industry than to employers in other industries." Todd, 275 F.3d at 203.   In so doing, "plaintiff[s are] simply alleging that a slight decrease in salary by a hypothetical oligopsonist cartel in the oil/petrochemical industry would not cause MPT employees to leave the industry because they would have difficulty finding compensation fully reflecting the value of their experience elsewhere." Id. at 204.   The Todd court stated that Plaintiffs would have to prove their theory "with economic evidence regarding the cross-industrial elasticity of MPT employees":

> Evidence could include information regarding, for example, the extent to which decreases in oil/petrochemical industry salaries, or increases that do not keep pace with increases in other industries, cause MPT employees to leave the industry; whether MPT employees who leave or are displaced from the oil/petrochemical industry suffer pay cuts upon switching industries; and whether it takes longer for MPT employees who leave or are displaced from oil/petrochemical industry jobs to find employment in other industries than within the same industry.

Id. at 204.[2]

Although the Todd court found that "the allegation of a market limited to employers in the oil and petrochemical industry [was] plausible on its face," the court stated that it was not "indicat[ing] whether plaintiff will succeed in proving the alleged market," because "[i]t remains to be seen whether *every* category of MPT employee in the plaintiff class can demonstrate the

---

[2] In this context, the Todd Court stated that the fact that the plaintiff, Robert Todd, "left Exxon for a higher paying job outside of the industry . . . is but one small piece of the broader cross elasticity analysis."   Id. at 204 & n.7.

requisite degree of [cross-industrial] inelasticity." Id. at 204-205 (emphasis in original). Thus, the Todd court realized that some MPT employees might be able to find reasonably substitutable job opportunities outside the oil and petrochemical industry. Accordingly the relevant labor market for those employees may not be confined to the oil and petrochemical industry. Indeed, the Court noted that:

> While interchangeability of the different types of employees is not an element of market definition in an oligopsony, the different types of employees will differ in how they must prove the interchangeability among employers. For example, as the district court and defendants point out, oil industry employers may not be interchangeable with pharmaceutical industry employers from the standpoint of a petroleum geologist, but the two may be more interchangeable from the standpoint of a labor lawyer. More importantly, the means of proof may be quite different; at trial the geologists must present evidence of the relative job prospects for geologists outside the oil industry, while the lawyers must explore the legal job market.

Id. at 202 n.5.[3]  Similarly, the Todd Court noted that "pilots-a category of MPT employee-may have a dubious claim of cross-industrial inelasticity." Id. at 250 n.8.

Here, class certification has been denied twice. At issue is the market relevant to the individual plaintiffs that remain. Thus, under the traditional method, each of the remaining Plaintiffs must "demonstrate the requisite degree of [cross-industrial] inelasticity" regarding their job opportunities.

### 2.    Direct Evidence

At this stage of the litigation, Plaintiffs have declined to pursue the traditional method of demonstrating market power in favor of attempting to show market power by "direct evidence." (Pls.' Br. at 14-23.) The Todd Court instructed the district court to "consider whether plaintiff

---

[3] The Second Circuit noted that because of these differences, the large proposed class might have difficulty with class certification. This proved to be the case.

has demonstrated anticompetitive effects as part of the court's assessment of defendants' market power." <u>Todd</u>, 275 F.3d at 207.  But the <u>Todd</u> Court did not outline what evidence would constitute direct evidence of an anticompetitive effect in this case.  <u>Id.</u>

As the Seventh Circuit has recognized, "[e]conomic analysis is virtually meaningless if it is entirely unmoored from at least a rough definition of a product and geographic market." <u>Republic Tobacco v. N. Atl. Trading Co. Inc.</u>, 381 F.3d 717, 737 (7th Cir. 2004).  Thus, according to the Seventh Circuit, the direct evidence method does not "allow an antitrust plaintiff to dispense entirely with market definition."  <u>Id.</u>  Instead the cases that outline this method "stand for the proposition that if a plaintiff can show the rough contours of a relevant market, and show that the defendant commands a substantial share of the market, then direct evidence of anticompetitive effects can establish the defendants' market power - in lieu of the usual showing of a precisely defined relevant market and . . . market share."  <u>Id.</u>  This Court agrees with the reasoning of the <u>Republic Tobacco</u> court.  Moreover, in this Court's opinion on Plaintiffs' motion for reconsideration of the Court's denial of the second motion for class certification, the Court stated that:

> Plaintiffs would indeed have to prove the relevant product market, even if they use the direct evidence method to prove their claims.  Under that approach, Plaintiffs can avoid 'calculations of elusive market share figures.'  But even using the direct evidence method, at a minimum, Plaintiffs must define the parameters of the market in question.  Indeed, the *Todd* opinion and the cases to which it cites in support of the direct evidence method all presume the existence of some definable market.

(Op. on Mot. for Recons., Docket No. 128 at 3 (citation omitted).)  In the same opinion, the Court also addressed the declaration of Plaintiffs expert, Professor Card, which outlined Plaintiffs' proposed method of proof.  The Court stated that "[b]ut even under the direct evidence

method of proof described by Professor Card, Plaintiffs would have to provide evidence of actual adverse effects within a *specific market*." (Id. at 4).

Plaintiffs argue, as they did on the motion for reconsideration, that they do not need to define a relevant market.  The Court sees no reason to change its position.  In addressing the motion for reconsideration, the Court distinguished the cases Plaintiff cited at that time by stating that "the Todd opinion and the cases to which it cites in support of the direct evidence method all presume the existence of some definable market." (Id. at 3.)  Plaintiffs fail to address this distinction in their briefing.  Moreover, Plaintiffs rely on only one opinion that is more recent that this Court's ruling on the motion for reconsideration: Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297 (3d Cir. 2007).  In Broadcom, the Third Circuit reversed the district court's dismissal under Rule 12(b)(6) of the plaintiffs Sherman Act § 2 claims.[4]  While discussing the state of the law regarding monopoly power under Section 2, the Third Circuit stated in a footnote that "direct proof of monopoly power does not require a definition of the relevant market." Id. at 307 n.3.  The Third Circuit did not state that the direct evidence could be completely untethered or unmoored from a roughly identified relevant market.  Therefore, this Court does not view the footnote from Broadcom as controlling here.  In short, the Court concludes that the direct evidence must be "moored" to an appropriate relevant market.  Although Plaintiffs may not need to define the relevant market with the same level of precision that is required under the traditional method of demonstrating market power, Plaintiffs are required to prove, at least

---

[4] Direct proof was not a contested issue in Broadcom. Indeed, the court identified "the relevant market as the market for Qualcomm's proprietary WCDMA technology" and ruled that the "Complaint adequately alleged . . . monopoly power in the relevant market." 501 F.3d at 315.

14

roughly, the parameters of the relevant labor markets.[5]

Plaintiffs also argue that they "have alleged and can show 'the rough contours of a relevant market' i.e., the market for MPT labor." (Pls.' Br. at 21.)  Plaintiffs insist that there is one relevant market for all the Plaintiffs.  Indeed, Plaintiffs argue that individual labor markets have "no bearing on the conduct challenged in this case." (Pls.' Br. at 1.)  In this regard, Plaintiffs' argument is both wrong and contrary to the prior rulings of this Court and the Todd court.  As the Todd court recognized in its analysis under the traditional method, the relevant markets here are the jobs that are reasonably good substitutes for each Plaintiff.  While Plaintiff's decision to use the direct evidence method may alter whether Plaintiffs must precisely define the relevant markets, it simply does not alter the labor markets that are relevant to this antitrust case.[6]

## B.    Evidence Concerning the Individual Plaintiffs

Defendants set forth, at length, evidence regarding the employment opportunities of each of the named Plaintiffs.  (Defs.' Br. at 15-35.)  In essence, Defendants argue that each of the individual plaintiffs had "substitutable employment opportunities outside of defendants, and that consequently, 'the market of employment opportunities available to [Plaintiffs]' is not confined

---

[5] None of the cases cited by Plaintiff stand for the proposition that "direct evidence" can be completely untethered or unmoored from a roughly identified relevant market.  Indeed, the only other Third Circuit case cited by Plaintiff on this point presumes the existence of some roughly definable relevant product market.  See Brown Univ., 5 F.3d at 668 ("The Plaintiff bears the initial burden . . . of showing . . . anticompetitive effects within the relevant product and geographic markets").

[6] Notably, Plaintiffs do not argue that they can prove market power by direct evidence in the job markets relevant to the ten individual Plaintiffs in this case.  For example, Plaintiffs do not contend that they could show that there was anticompetitive conduct in the labor market applicable to Ms. Todd.  Nor do Plaintiffs contend that they can show that the labor market applicable to Ms. Todd is limited to the oil and petrochemical industry.

to defendants." (Defs.' Br. at 3.) Defendants contend that the employment opportunities outside of the oil and petrochemical industry would use "the same skill set [that Plaintiffs] used at their defendant-employers." (Id. at 5.) Plaintiffs contest some of the evidence.

Regardless of these disagreement, the evidence before the Court further demonstrates that the relevant labor markets for the individual plaintiffs are not necessarily limited to the oil and petrochemical industry and in fact vary based upon the individual's qualifications and experience. See, e.g., Declaration of Mark S. Germann in Support of Defendants' Motion for Summary Judgment, Ex. 2, August 28, 1997 Dep. of Roberta Todd at 91-95 (Ms. Todd worked at Exxon as a financial analyst, was trained on SAP's financial software and when she was terminated by Exxon, she had a placement firm "send [her] the resume at that time to any company that was interested in SAP skills"). The Court sees no need to recite the lengthy list of details concerning the employment opportunities available for each of the individual Plaintiffs because, as discussed below, each Plaintiff's claim fails for the same reason.

### C.    Application of Summary Judgment Standard

As the Court concluded above, Plaintiffs are required to prove, at least roughly, the parameters of the specific labor markets relevant to the individual Plaintiffs. Summary judgment is appropriate because Plaintiffs have not offered any evidence that these labor markets are limited to the oil and petrochemical industry and Plaintiffs do not seek discovery on this issue. Therefore, no reasonable jury could find for Plaintiffs.

The Court rejects Plaintiffs' argument that summary judgment is inappropriate because the discovery thus far raises genuine issues of material fact. In support of this contention, Plaintiffs reference various statements by Defendants concerning the total compensation paid to

all MPT employees and the average compensation of all MPT employees.  (Pls.' Br. at 23-26;

Pls.' Ans. to Defs.' Statement of Undisputed Facts and Counterstatement of Disputed and

Undisputed Facts, ("Pls.' Statement of Facts") at 6-65).   But on summary judgment, the Court

will not simply assume that the relevant individual labor markets are limited to the oil and

petrochemical industry on the basis of statements that go to all MPT employees.  Plaintiffs has

offered no other evidence that the labor markets relevant to the individual plaintiffs are limited to

the oil and petrochemical industries.  Notably, Plaintiffs have not offered evidence that

employers in other industries would not be reasonable substitutes for the individual Plaintiffs.

Moreover, Plaintiffs have not offered "direct evidence" of anticompetitive effects in the

particular relevant markets.  In fact, the evidence before the Court on these individual markets

indicates that the markets extend in different ways and to different degrees beyond the oil and

petrochemical industry.  (Defs.' Statement of Undisputed Facts Pursuant to L.Civ.R. 56.1; Pls.'

Statement of Facts at 2-5.)  Thus, the Court concludes that Plaintiffs do not create a genuine issue

of material fact as to whether the market relevant to each remaining Plaintiff is confined to the oil

and petrochemical industry.

Similarly, Plaintiffs do not create a genuine issue of material fact as to whether there was

an oil industry premium in the relevant labor markets.  Plaintiffs simply have not brought forth

any evidence of a oil industry "premium" applicable to the individual Plaintiffs, despite the fact

that such salary information is likely available through third parties and through the Plaintiffs

themselves.  Although figures and statements regarding the total or average compensation for all

MPT employees involves many job markets, such averages and totals, by their nature, do not

provide evidence of the compensation levels in any single Plaintiff's labor market.  For similar

17

reasons, Plaintiffs do not create a genuine issue of material fact as to whether there was a reduction in any such oil industry premium in the relevant labor markets.  Therefore, Plaintiffs' argument that "the evidence adduced thus far . . . supports the proposition that the information exchanges enabled the defendants to align their total pay, and to move it closer to general industry levels"  (Pls.' Br. at 23) is not sufficient to stave off summary judgment.

Next, the Court rejects Plaintiffs' contention that summary judgment is inappropriate because Defendants rely "on nothing more than the same facts that the Second Circuit *rejected* as [in]sufficient to defeat plaintiffs' claims."  (Pls.' Br. at 2-3.)  Courts review summary judgment motions under a different standard than motions to dismiss.  Therefore, Plaintiffs's claims will not survive a motion summary judgment merely because the Complaint survived a Rule 12(b)(6) motion.

This Court accepts that Plaintiffs' asserted a plausible theory.  See Todd, 275 F.3d at 195.  The Todd court found it plausible for the purpose of ruling on a motion to dismiss that the markets of reasonably substitutable employers for MPT employees would be limited to the oil and petrochemical industry.  Indeed, the Todd court also found it plausible that the relevant labor markets might be limited to employers in the oil and petrochemical industry, despite the fact that the individual Plaintiffs may have been able to find employment outside of the oil and petrochemical industry.  Id. at 204 & n.7.

But plausibility is not the standard on a motion for summary judgment.   Pursuant to Federal Rule of Civil Procedure 56(e), "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading rather, its response must . . . set out specific facts showing a genuine issue for trial."

Defendant has properly made a motion for summary judgment and supported it with deposition testimony and other evidence.  Plaintiffs do not bring forth evidence sufficient to show that there is a genuine issue for trial.[7]

### D.        56(f) Affidavit

Finally, Plaintiffs have failed to identify with specificity any discovery that would result in the denial of summary judgment.

The Court is aware that merits-based discovery has not, for the most part, been permitted to proceed.  In the context of Rule 12(b)(6) motions to dismiss, the Supreme Court has warned that "in antitrust cases . . . dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly."  Hosp. Bldg. Co. v. Trs. of Rex Hosp., 425 U.S. 738, 746 (1976).  Similar concerns apply to this case.  In fact, the Third Circuit has repeatedly "criticized the practice of granting summary judgment motions at a time when pertinent discovery requests remain unanswered by the moving party." Lunderstadt, 885 F.2d at 70 (internal quotations and citations omitted).  Thus, "[i]f discovery is incomplete in any way material to a pending summary judgment motion, a district court is justified in not granting the motion." Abington Friends School, 480 F.3d at 257 (citation omitted).  However, the Supreme Court recently noted that "[i]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive." Bell Atlantic

---

[7] Moreover, it is not clear that the evidence put forth by Defendants was before the Second Circuit in Todd.  Although the parties dispute the precise extent of discovery that has taken place, there was some degree of discovery in the Todd v. Exxon matter after the Second Circuit remanded the matter.  (56(f) Aff. at 2; Defs.' Reply Br. at 14 n.4.)  Moreover, in this consolidated action, the parties have conducted class discovery, which included depositions of the individual plaintiffs.

Corp. v. Twombly, 127 S. Ct. 1955, 1966-67 (2007).  Moreover, a "district court has discretion in acting on Rule 56(f) motions."  Horvath, 333 F.3d at 458 (internal quotations and citations omitted).

      In their brief and Rule 56(f) Affidavit, Plaintiffs outline a number of topics on which they wish to take discovery, namely "what occurred during the Oil [I]ndustry Roundtable Meetings and other face-to-face meetings among defendants' senior compensation executives," "discovery of the 'direct exchanges' among defendants," discovery regarding "whether defendants acting collectively, were able to slow down the rate of industry salary growth," and discovery regarding "the nature and scope of the information exchanges; the purpose and effect of the exchanges' [and] whether there was any agreements [sic] among defendants concerning the use of the information." (Pls.' Br. at 10-11; Rule 56(f) Affidavit of Ellen Meriwether ("56(f) Aff.") at 7-8, 12.)  Plaintiffs argue that this "additional merits discovery . . . would demonstrate that defendants' exchanges of information facilitated the coordination of their MPT compensation levels at ranges below the ranges that which would have prevailed in a truly competitive market." (56(f) Aff. at 11.)  Plaintiffs also request "information as to what transpired at the face-to-face meetings among defendants' senior compensation executives and in the direct exchanges of information among the defendants."  (Id. at 12.)  Plaintiffs claim this discovery "will create additional genuine issues of material [fact] as to whether defendants entered into an agreement . . . that . . . would subject the defendants to liability under the *per se* rule."  (Id.)  At oral argument, Plaintiffs clarified that all of their 56(f) discovery requests go to their theory of a single market for all MPT employees, and not to the employee-specific markets.

      Defendants argue that "Plaintiffs' discovery requests are pretextual" and that "the

discovery that they seek . . . is irrelevant to this narrowly focused summary judgment motion."
(Defs.' Reply Br. at 13-14.)   Moreover, Defendants argue that the requested discovery could not
demonstrate Plaintiffs' "(i) industry-specific expertise, (ii) outside job opportunities, or (iii)
unsubstantiated MPT employee labor market."  (Id. at 14.)

  First, the Court rejects Plaintiffs' request for discovery regarding the existence of a price-
fixing agreement that would be subject to *per se* condemnation.  Such discovery would be, as
Defendants' contend, "an eleventh hour (or eleventh year) fishing expedition." (Defs.' Reply Br.
at 15)  Plaintiff simply has not previously alleged that this case involved any *per se* violations,
much less a price-fixing agreement.  See Op. on Mot. for Class Certification, dated May 27, 2003
(Docket No. 82) at 5 ("Plaintiffs' antitrust action is brought under the rule of reason theory as
opposed to the *per se* theory"); Todd, 275 F.3d at 199 ("plaintiff does not allege an actual
agreement among defendants to fix salaries").[8]  Therefore, the Court will not allow such
discovery.

  Second and more importantly, the Court fails to see how any of the discovery requests,
which, Plaintiffs admit, all go to a single market for all MPT employees, would prevent summary
judgment.  Plaintiffs' discovery requests simply do not address the markets that the Todd court
recognized as being relevant to the individual plaintiffs.  The requested discovery also does not
address whether there was a premium in these particular labor markets.  Moreover, the requested
discovery does not address whether Defendants reduced these alleged premiums, much less
whether Defendants were able to collectively reduce the premiums while retaining the employees

---

[8] At oral argument, Plaintiffs seemingly conceded this point by acknowledging that they
were not alleging the existence of an agreement subject to *per se* condemnation.

in the relevant labor markets.  Thus the Court concludes that such discovery would not enable a reasonable jury to find for Plaintiffs.

Thus, the Court concludes that in Plaintiffs' Rule 56(f) affidavit is not sufficient to prevent summary judgment.

## III.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment.  An appropriate form of order is filed herewith.


Dated: August 19, 2008


_____s/ Garrett E. Brown, Jr._____
GARRETT E. BROWN, JR., U.S.D.J.
